IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRONE AUGUSTIS MASON, JR., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 22-3312 |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA DEPARTMENT OF | : | |
| PRISONS, CORIZON HEALTH, DEPUTY | : | |
| WARDEN HARRIS, CAPTAIN DUNKIN, | : | |
| and CAPTAIN HINTON, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                          February 7, 2023

A *pro se* pretrial detainee has sought leave to proceed *in forma pauperis* in an action brought under 42 U.S.C. § 1983 against a county's department of prisons, the private health company providing medical services at one of the county's jails, and a deputy warden and two supervisory correctional officers from that county jail. The factual basis for these claims appears to arise out of the pretrial detainee being placed in punitive segregation and then administrative segregation for misconduct he did not commit, alleged deliberate indifference to his serious medical needs when he injured himself on multiple occasions, the falsification of a report relating to a medical clearance needed while he was in disciplinary segregation, and the types of restraints used on him while he was in administrative segregation given his known medical conditions. As discussed below, although the court will grant leave to proceed *in forma pauperis*, the court must dismiss the complaint for the failure to state a claim. This dismissal will be with prejudice as to any claim against the count department of prisons because it is not a proper defendant in a section

1983 action. The dismissal will be without prejudice to any other claim that may have been raised in this case.

## I.    ALLEGATIONS AND PROCEDURAL HISTORY

The *pro se* plaintiff, Tyrone Augustis Mason, Jr. ("Mason"), filed an application for leave to proceed *in forma pauperis* (the "IFP Application") and a complaint, which the clerk of court docketed on August 17, 2022. *See* Doc. Nos. 1, 2. Because Mason did not file a copy of his prison account statement with his IFP Application, this court entered an order on September 29, 2022, denying the IFP Application without prejudice, and directing Mason to file his prison account statement no later than 30 days from the date of the order. *See* Doc. No. 4. Mason submitted a copy of his prison account statement, which the clerk of court docketed on November 4, 2022. *See* Doc. No. 5.

In the complaint, Mason raises claims under 42 U.S.C. § 1983 for alleged constitutional violations which occurred while he was a pretrial detainee at Riverside Correctional Facility ("Riverside") in Philadelphia. *See* Compl. at ECF pp. 3, 5, Doc. No. 1. Mason has named the following defendants in the complaint: (1) the Philadelphia Department of Prisons ("PDP"); (2) Corizon Health ("Corizon"); (3) Riverside Deputy Warden Harris ("Deputy Warden Harris"); and (4) two Riverside supervisory correctional officers, Captain Hinton ("Capt. Hinton") and Captain Dunkin ("Capt. Dunkin").[1] *See id.* at ECF pp. 3–4.

Mason's claims arise from his placement in a punitive segregated housing unit following a disciplinary hearing at Riverside, his subsequent transfer to an administrative housing unit there, and injuries he sustained while he was confined to restricted housing. The events giving rise to his

---

[1] The court recognizes that Mason mentions numerous Riverside correctional officers and other individuals in the body of his complaint. *See* Compl. at ECF pp. 6–10. However, he does not include them as defendants in the caption of the complaint or identify them as defendants in the body of the complaint. *See id.* at ECF pp. 1–4. Therefore, it does not appear that he intended to assert claims against them.

claims are alleged to have occurred between May 18, 2022, and July 31, 2022, at Riverside. *See id.* at ECF p. 5.

Mason alleges that the first event occurred on May 18, 2022, when he was working as a barber in Riverside's barber shop. *See id.* at ECF p. 6. During this shift, another inmate left a laundry bag at Mason's workstation.[2] *See id.* So that he was not "held responsible" for this laundry bag, Mason placed the bag outside of his work area. *See id.* A "little later," Mason fell and injured his head.[3] *See id.* Because of this head injury, Mason went to the medical department to be treated. *See id.* Mason later returned to his unit and was approached by corrections officers Marlow and Blair, who allegedly told him that video surveillance showed him with the laundry bag, which was discovered to have contained an iPhone and charger. *See id.* Mason denied that the bag belonged to him and therefore, he had no idea what was inside of it. *See id.*

On May 20, 2022, Mason was taken to a disciplinary hearing where Capt. Dunkin served as the hearing examiner. *See id.* Mason told Capt. Dunkin that the laundry bag was not his, and he requested that Capt. Dunkin review surveillance footage that Mason believed would prove that he did not enter the barbershop with the bag. *See id.* Despite this request, Capt. Dunkin did not review the surveillance footage, found Mason guilty, and sentenced him to 30 days in punitive segregation, to be followed by a period in administrative segregation. *See id.* Mason filed an appeal from this decision along with a grievance, but he did not receive a response to either. *See id.*

On June 9, 2022, Mason became dizzy and lightheaded while in his cell and fell against the door, causing a nosebleed that would not stop. *See id.* at ECF p. 8. He pressed the emergency call button in his cell and banged on his door for help, but he did not receive a response to those

---

[2] Mason asserts that some inmates seeking haircuts would bring laundry, shower items, and cosmetic items along with them so that they could clean up after the haircut. *See* Compl. at ECF p. 6.
[3] Mason states that he suffers from a cardiac issue which causes dizziness, light headedness, and fainting. *See* Compl. at ECF p. 6.

attempts for help. *See id.* He only received a response from a correctional officer after another inmate had walked past his cell and notified the officers. *See id.* This correctional officer told Mason that she had called the medical department, but that medical assistance would be delayed due to a shift change. *See id.* To assist with the blood flow in the interim, the correctional officer provided toilet paper to Mason. *See id.* Mason alleges that he fell asleep while awaiting care and did not receive care until the next morning. *See id.* He was then transferred to Jefferson-Torresdale Hospital, where he was admitted and remained until June 16, 2022. *See id.*

Mason alleges that on June 22, 2022, a correctional officer escorted him to the medical department for an evaluation to medically clear him for transfer from punitive segregation to administrative segregation. *See id.* at ECF p. 7. While he was in the medical department, he was informed that the doctors had left. *See id.* In addition, a nurse and trainee were unable to access his medical records, and they did not know how to complete the medical form. *See id.* As a result, Mason was returned to his cell. *See id.*

On July 14, 2022, Mason attended an administrative segregation status hearing where Deputy Warden Harris, Capt. Hinton, a social worker, a member of the psychology department, and another correctional officer were present. *See id.* During the hearing, Mason told them that he feared for his safety because his health issues were not adequately considered, there were extreme security procedures, and the correctional officers had "laxed [sic] and incompetent monitoring habits." *Id.* Concerning the correctional officers' conduct, Mason noted that they do not tour the tiers, they ignore the inmates' call buttons, and they fail to respond to inmates banging on their doors for help. *See id.* Mason also stated that placing him in shackles or handcuffs connected to a chain belt threatened his safety because his heart condition and the side effects of his medication, which can cause him to stumble or occasionally fall. *See id.* At this point, Capt. Hinton produced

a form indicating that Mason had been medically cleared for placement in administrative segregation on June 22, 2022. *See id.* Mason informed Capt. Hinton of what occurred on that date,[4] asked them to view the surveillance footage from that day to confirm his recitation of what occurred, and claimed that Capt. Hinton's form was "fraudulent[] and manufactured." *Id.* Although Mason requested the name of the person who signed the form, so that he could file a grievance against that person, they refused to provide the name to him. *See id.*

On the evening of July 14, 2022, Mason became dizzy and fell, hitting his head on a metal table in his cell. *See id.* at ECF p. 8. Mason's head started to bleed, and he sat for 15 minutes holding tissue on his head to stop the bleeding. *See id.* Mason then pushed the emergency call button and banged on his cell door for help, but no one responded. *See id.* Mason was able to get the attention of the inmate block worker, who told him that no correctional officers were on the unit. *See id.* Mason waited for 15 minutes until two correctional officers arrived. *See id.* Another correctional officer then took him to the medical department where they cleaned and bandaged his head injury. *See id.* He was then transported back to his cell. *See id.*

Mason alleges that on July 24, 2022, he was allowed out of his cell for one hour of recreation. *See id.* at ECF p. 9. He was handcuffed and shackled.[5] *See id.* While he was talking to two other inmates in front of a cell, he felt dizzy and, due to the shackles, fell onto his knee. *See id.* Then, due to the handcuffs rendering him incapable of breaking his fall, he hit his midsection on a metal stool that was bolted to the floor. *See id.* This caused the wind to be knocked out of him. *See id.* While Mason was on the ground, other inmates notified the correctional officers, who called for medical assistance. *See id.* Mason was then transported to the medical department, where

---

[4] The court presumes that Mason told them that the medical staff did not evaluate him on June 22, 2022.
[5] Mason avers that the handcuffs were connected to a metal chain belt. *See* Compl. at ECF p. 9.

he received a physical examination and bandages for his scrapes. *See id.* He was then returned to his cell. *See id.*

The final event Mason describes in the complaint occurred on July 31, 2022. *See id.* at ECF p. 10. In the early morning, Mason became light-headed and fell forward onto his face. *See id.* His nose started to bleed, and he could not stop the bleeding despite trying to do so for 30 minutes. *See id.* Mason called for help, and a correctional officer responded. *See id.* The correctional officer called the medical department, and a nurse came to examine Mason. *See id.* The nurse took Mason's vitals and examined his injury. *See id.* When the nurse removed the tissue from Mason's nose, "blood and clots the size of smashed prunes came out of [his] nose and mouth." *Id.* Mason's blood fell on the table, floor, and his clothes. *See id.*

The nurse then called the medical department for instructions, and someone there told her to give Mason gauze and keep him in his cell until the shift change at 7:00 a.m. *See id.* While in the cell, Mason ran out of gauze and tissues, and blood "was getting everywhere." *Id.* Mason then called for a correctional officer, and one arrived and transported him to the medical department. *See id.* The medical staff "tried everything to stop the bleed [sic]" for three hours, but they were unsuccessful. *Id.* Because they could not stop the bleeding, Mason was ordered to be transported to Jefferson-Torresdale Hospital. *See id.* Mason complains that due to a lack of staffing, there were not enough correctional officers to transport him to the hospital. *See id.* This caused Mason to have to wait in the receiving room for five hours while still bleeding profusely. *See id.* Mason eventually was taken to the hospital where hospital staff were able to stop the bleeding. *See id.* By 9:00 p.m., Mason was back in his cell. *See id.*

Based on these factual allegations, Mason raises claims under 42 U.S.C. § 1983. *See id.* at ECF p. 3. However, other than his passing reference to section 1983, Mason does not identify the

specific statutory or constitutional basis for his claims. *See id.* He does, however, specifically state

the relief he is seeking in this case. Mason seeks (1) to be removed from the segregated housing

unit, (2) a fair hearing on the misconduct charge based on the alleged possession of the iPhone,

"where all . . . evidence is properly and thoroughly investigated," included the surveillance footage

from the date of the incident, (3) regular infirmary visits to monitor his health, (4) a requirement

that medical and security staff properly monitor his health, and (5) the identity of the individual

who signed the form clearing him for transfer to administrative segregation.[6] *See id.* at ECF p. 11.

It does not appear that he seeks any monetary damages or other relief. *See id.*

## II.   DISCUSSION

### A.   The IFP Application

Regarding applications to proceed *in forma pauperis*,

> any court of the United States may authorize the commencement, prosecution or
> defense of any suit, action or proceeding, civil or criminal, or appeal therein,
> without prepayment of fees or security therefor, by a person who submits an
> affidavit that includes a statement of all assets such prisoner possesses that the
> person is unable to pay such fees or give security therefor.

28 U.S.C. § 1915(a)(1). This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal
> courts." *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338
> (1989). Specifically, Congress enacted the statute to ensure that administrative
> court costs and filing fees, both of which must be paid by everyone else who files
> a lawsuit, would not prevent indigent persons from pursuing meaningful litigation.
> *Deutsch*[ *v. United States*, 67 F.3d 1080, 1084 (3d Cir. 1995)].  Toward this end, §
> 1915(a) allows a litigant to commence a civil or criminal action in federal court in
> [sic] *forma pauperis* by filing in good faith an affidavit stating, among other things,
> that he is unable to pay the costs of the lawsuit. *Neitzke,* 490 U.S. at 324, 109 S.Ct.
> 1827.

*Douris v. Middletown Twp.*, 293 F. App'x 130, 131–32 (3d Cir. 2008) (per curiam) (footnote

omitted).

---

[6] Mason appears to want the individual's name so he can sue them. *See* Compl. at ECF p. 11.

The litigant seeking to proceed *in forma pauperis* must establish that the litigant is unable to pay the costs of suit. *See Walker v. People Express Airlines, Inc.*, 886 F.2d 598, 601 (3d Cir. 1989) ("Section 1915 provides that, in order for a court to grant *in forma pauperis* status, the litigant seeking such status must establish that he is unable to pay the costs of his suit."). "In this Circuit, leave to proceed *in forma pauperis* is based on a showing of indigence. [The court must] review the affiant's financial statement, and, if convinced that he or she is unable to pay the court costs and filing fees, the court will grant leave to proceed *in forma pauperis*." *Deutsch*, 67 F.3d at 1084 n.5 (internal citations omitted).

Here, after reviewing the IFP Application, it appears that Mason is unable to prepay the fees to commence this civil action. Therefore, the court will grant him leave to proceed *in forma pauperis*.[7]

### B.  Standard of Review – Screening of Complaint Under 28 U.S.C. § 1915

Because the court has granted Mason leave to proceed *in forma pauperis*, the court must engage in the second part of the two-part analysis and examine whether the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or asserts a claim against a defendant immune from monetary relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)–(iii) (providing that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-- . . . **(B)** the action or appeal—**(i)** is frivolous or malicious; **(ii)** fails to state a claim on which relief may be granted; or **(iii)** seeks monetary relief against a defendant who is immune from such relief"). A complaint is frivolous under section 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact," *Neitzke*, 490

---

[7] As Mason is a prisoner, he must fully pay the filing fee in installments due to the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

U.S. at 325, and is legally baseless if it is "based on an indisputably meritless legal theory." *Deutsch*, 67 F.3d at 1085. As for whether a complaint is malicious,

> [a] court that considers whether an action is malicious must, in accordance with the definition of the term "malicious," engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit to determine whether the action is an attempt to vex, injure or harass the defendant.

*Id.* at 1086. "[A] district court may dismiss a complaint as malicious if it is plainly abusive of the judicial process or merely repeats pending or previously litigated claims." *Brodzki v. CBS Sports*, Civ. No. 11-841, 2012 WL 125281, at *1 (D. Del. Jan. 13, 2012).

Concerning the analysis under section 1915(e)(2)(B)(ii), the standard for dismissing a complaint for failure to state a claim pursuant to this subsection is identical to the legal standard used when ruling on motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) (applying Rule 12(b)(6) standard to dismissal for failure to state claim under section 1915(e)(2)(B)). Thus, to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556 (citation omitted).

In addressing whether a *pro se* plaintiff's complaint fails to state a claim, the court must liberally construe the allegations set forth in the complaint. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) ("At this early stage of the litigation, we accept the facts alleged [in the *pro se*] complaint as true, draw all reasonable inferences in [the *pro se* plaintiff's] favor, and ask only whether that complaint, liberally construed, . . . contains facts sufficient to state a plausible . . . claim." (citation, internal quotation marks, and all original alterations omitted)); *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) ("We construe Vogt's pro se filings liberally. This means we

remain flexible, especially 'when dealing with imprisoned pro se litigants' like Vogt." (internal citations omitted) (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013))); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Yet, conclusory allegations will not suffice. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

Additionally, when construing a *pro se* plaintiff's complaint, the court will "'apply the relevant legal principle even when the complaint has failed to name it.'" *Vogt*, 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 244). However, *pro se* litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" *Id.* (quoting *Mala*, 704 F.3d at 245).

## C.    Analysis

Although Mason has not specifically identified his legal claims in this case, he appears to be raising claims based on his placement in punitive segregation following a disciplinary hearing, the conditions of confinement in administrative segregation, and several instances of alleged deliberate indifference to his serious medical needs. The vehicle for Mason to assert these claims in this court is 42 U.S.C. § 1983. Section 1983 provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. When attempting to establish a claim under section 1983, a plaintiff must allege and prove that a "person" deprived the plaintiff of a constitutional right while acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff

must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). As explained below, Mason has failed to plead plausible section 1983 claims in his complaint.

### 1.    Claims Against PDP

Although Mason names PDP as a defendant in this case, this claim is implausible because city agencies are not "persons" under section 1983 insofar as they do not have a separate legal existence apart from the city itself. *See Russell v. City of Philadelphia*, 428 F. App'x 174, 177 (3d Cir. 2011) (per curiam) ("[T]he Philadelphia Prison System, [a] department[] of the City of Philadelphia itself, [is] not a proper defendant[]" in an action brought under section 1983." (citing 53 P.S. § 16257 and *Bey v. City of Philadelphia*, 6 F. Supp. 2d 422, 423 (E.D. Pa. 1998))); *Durham v. Philadelphia Prison Sys.*, Civ. A. No. 18-2113, 2018 WL 3105589, at *2 (E.D. Pa. June 25, 2018) ("Philadelphia Prison System is not an entity that is subject to suit separate from the City of Philadelphia" (citing 53 P.S. § 16257)); *Vurimindi v. City of Philadelphia*, Civ. A. No. 10-88, 2010 WL 3169610, at *1 (E.D. Pa. Aug. 10, 2010) (concluding that plaintiff could not maintain section 1983 claims against City of Philadelphia agencies because under 53 P.S. § 16257, "no such department shall be taken to have had . . . a separate corporate existence, and hereafter all suits growing out of their transaction . . . shall be in the name of the City of Philadelphia"); *see also Vangjeli v. City of Phila*, Civ. A. No. 15-1566, 2015 WL 5793926, at *3 (E.D. Pa. Sept. 30, 2015) (dismissing section 1983 claim against Free Library of Philadelphia because it was not entity subject to suit since no department or agency of City of Philadelphia has separate corporate existence), *aff'd sub nom. Vangjeli v. City of Philadelphia*, 655 F. App'x 132 (3d Cir. 2016) (per curiam); *Bush v. City of Philadelphia Police Dep't*, 684 F. Supp. 2d 634, 636 (E.D. Pa. 2010)

(dismissing Philadelphia Police Department as matter of law because it is not legal entity separate from City of Philadelphia). Because the PDP is not considered a "person" for purposes of section 1983, Mason's claim against it is implausible and the court will dismiss the claim with prejudice. *See White v. City of Philadelphia*, Civ. A. No. 21-CV-2688, 2021 WL 4169424, at *3, 6 (E.D. Pa. Sept. 14, 2021) (dismissing section 1983 claims against PDP with prejudice).

### 2.    Claims Against Deputy Warden Harris

Despite Mason naming Deputy Warden Harris as a defendant in the complaint, the only allegation relating to him is that he was present at Mason's July 14, 2022 administrative segregation status hearing. *See* Compl. at ECF p. 7. Mason does not allege that Deputy Warden Harris conducted the hearing or was otherwise involved in the proceeding. However, he does allege that he raised concerns about his safety during the hearing arising from his perception that inmates in administrative segregation were subjected to extreme security procedures, such as shackling, and that correctional officers assigned to the unit failed to monitor inmates and were slow to respond to call button alarms from inmates' cells. *See id.* Mason also avers that he advised the hearing board that shackling was a particular threat to him because of his heart condition, which he asserts causes him to because dizzy and unsteady on his feet. *See id.*

Although these allegations would appear to be Mason's attempt to challenge his placement in administrative segregation due to his medical condition, he further alleges that Capt. Hinton, who was also present at the hearing, produced a form indicating that Mason had been medically cleared for placement in administrative segregation. *See id.* Mason asserts that the form was falsified as the medical staff had not evaluated him before his transfer to administrative segregation. *See id.* While Mason tried to obtain the name of the individual who signed the form, it was not provided to him. *See id.*

The issue with these allegations as related to Deputy Warden Harris is that none of them pertain to him. The only allegation relating to him is that he was present at the hearing. Therefore, the nature of Mason's claim is unclear. Nevertheless, construing the complaint liberally, Mason may be attempting to assert a claim against Deputy Warden Harris based on his supervisory position as a deputy warden. If this in fact is Mason's claim, he has failed to state a plausible claim for relief.

If a section 1983 plaintiff seeks to hold a supervisor liable for the unconstitutional acts by subordinates, there are two theories of supervisory liability: (1) "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and (2) "[A] supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); *see Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim), *rev'd on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (per curiam) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005))).

13

Here, Mason has not alleged any facts describing conduct that Deputy Warden Harris engaged in, other than being present at the status hearing.[8] Thus, he has not alleged a plausible supervisory liability claim against Deputy Warden Harris, and the court will dismiss this claim. However, because the court cannot state with certainty that Mason will never be able to allege a plausible supervisory liability claim – or some other claim – against Deputy Warden Harris, the court will grant Mason leave to amend his claims against him.[9]

---

[8] Mason also did not identify a practice, policy, or custom that Deputy Warden Harris established, which violated his constitutional rights. A "policy" arises when a decision-maker possessing final authority issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, a plaintiff must establish that the defendant "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to [the plaintiff's] injury." *Id.* (internal quotation marks and alterations omitted). Regardless of whether a plaintiff is seeking to impose municipal liability for a policy or a custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see also Bielevicz*, 915 F.2d at 850 (explaining that in both methods to obtain liability under *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978), "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

In addition,

[t]here are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." [*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 417 (1997)] (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice is likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18[.] (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390[ (1989)]); *see also Berg*[ *v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)] (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (third alteration in original) (internal footnote omitted).

[9] A district court should generally provide a *pro se* plaintiff with leave to amend unless amending would be inequitable or futile. *See Grayson v. Mayview St. Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002) (stating general rule). Also, "in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).

### 3.      Claims Against Corizon

Mason includes Corizon as a defendant in the caption of his complaint. However, the only specific allegation as to Corizon is Mason's description of its staff as doing everything they could to stop a nosebleed he suffered before ordering that he be transported to the hospital for further treatment. *See* Compl. at ECF p. 10. Although there are numerous other references to Mason being taken to "medical" for treatment of injuries, *see id.* at ECF pp. 6–10, these allegations, even giving them the most liberal construction, do not appear to allege that the quality of care provided by the medical staff resulted in a constitutional violation. Nevertheless, even if Mason was attempting to allege inadequate care by medical staff, he has not stated a plausible claim against Corizon.

"[A] private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'"[10] *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (per curiam) (quoting *Natale*, 318 F.3d at 583). Instead, a plaintiff must allege that the private health company violated their constitutional rights because of a custom or policy that it adopted. *See Cephas v. George W. Hill Corr. Fac.*, Civ. A. No. 09-6014, 2010 WL 2854149, at *2 (E.D. Pa. July 20, 2010) (explaining that *pro se* prisoner plaintiff seeking to assert claim against private health company providing services to county jail must allege that institutional policy or custom caused violation of plaintiff's rights, and dismissing complaint because it did not contain any such allegations); *see also Natale*, 318 F.3d at 583 (analyzing section 1983 claim against private health care provider under *Monell* municipal liability standard). Also, to assert a plausible claim under section 1983, the plaintiff

---

[10] "As Corizon Health has contracted with the City of Philadelphia to provide medical services to prison inmates, it is considered a state actor for purposes of § 1983." *Dixon v. City of Philadelphia*, Civ. A. No. 20-6515, 2021 WL 3722276, at *5 n.2 (E.D. Pa. Aug. 23, 2021) (citation omitted); *see also Natale*, 318 F.3d at 583–84 (acknowledging that entity contracted to perform medical services for county jail is state actor for purposes of section 1983); *Neuen v. PrimeCare Med., Inc.*, No. 09-509, 2011 WL 1104118, at *8 (E.D. Pa. Mar. 24, 2011) ("Private entities that contract with municipalities to provide services to prison inmates, as well as employees of those entities, are acting 'under color of state law.'" (citation omitted)).

"must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the applicable pleading standard. *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citation omitted).

In this case, Mason has not alleged that Corizon had a relevant policy or custom that led to a violation of his constitutional rights. As such, he has not pleaded a plausible claim against Corizon, and the court will dismiss any claim against it. This dismissal will be without prejudice because the court cannot state at this point that any amendment would be futile.

### 4.    Claims Related to Confinement in Segregated Housing

Mason alleges that following the incident with the laundry bag and the iPhone, he had a misconduct hearing presided over by Capt. Dunkin. *See* Compl. at ECF p. 6. At this hearing, Capt. Dunkin refused to consider Mason's version of events and would not look at surveillance footage as Mason requested. *See id.* Mason was later found guilty of misconduct and, as punishment, was placed in punitive segregation for 30 days to be followed by administrative segregation. *See id.* While in administrative segregation, Mason attended a status hearing during which he raised various safety concerns, including, *inter alia*, the use of shackles and handcuffs attached to a chain belt on people with medical issues like him. *See id.* at ECF p. 7. Later, Mason claims that he fell due to his medical condition and suffered injuries more severe than he would have suffered (if he would have suffered injuries at all) due to being placed in shackles and handcuffs connected to a chain belt. *See id.* at ECF p. 9. Based on these allegations, the court has interpreted the complaint to include a claim that Mason's due process rights were violated due to his placement in segregated housing and treatment while there. The court will first address any claim relating to Mason's placement in segregated housing before turning to his treatment there.

a.      Placement in Punitive Segregation

"Generally, prisons may sanction a pretrial detainee for misconduct that he commits while awaiting trial, as long as it is not a punishment for the 'underlying crime of which [the detainee] stands accused.'" *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172 F.3d 999, 1003−06 (7th Cir. 1999)). However, "[w]hile 'pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in [disciplinary segregation] without explanation or review of their confinement.'" *Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) (per curiam) (quoting *Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012)). In addition, "the imposition of disciplinary segregation [on pretrial detainees] for violation of prison rules and regulations cannot be imposed without providing the due process protections set forth in *Wolff v. McDonnell*, [418 U.S. 539 (1974)]." *Kanu*, 739 F. App'x at 116. "These protections include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." *Id.* (citing *Wolff*, 418 U.S. at 563−66); *see also Quiero v. Ott*, 799 F. App'x 144, 148 n.6 (3d Cir. 2020) (per curiam) ("*Wolff* requires: (1) written notice of the charges at least twenty-four hours prior to any hearing, (2) an opportunity to call witnesses and present evidence in one's defense, (3) an opportunity to receive assistance from an inmate representative, and (4) a written statement of the evidence relied on and the reasons for the disciplinary action.").[11]

A detention official punishes a pretrial detainee in violation of the Due Process Clause by restricting the detainee and "(1) 'there is a showing of express intent to punish on the part of [those]

---

[11] "[G]reater process [is] accorded to prisoners who are confined for disciplinary infractions than those moved for purely administrative reasons." *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007) (citation omitted).

[] officials'; (2) 'the restriction or condition is not rationally related to a legitimate non-punitive government purpose,' i.e., 'if it is arbitrary or purposeless'; or (3) 'the restriction is excessive in light of that purpose.'" *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017) (alterations in original) (quoting *Stevenson*, 495 F.3d at 67−68). "[M]aintaining internal security and order in jails and prisons are 'legitimate governmental objectives'" that may justify placement of a detainee in administrative segregation, and "courts must give prison officials considerable discretion to manage internal security in their institutions." *Id.*

In this case, Mason does not allege that he was not provided with written notice of the charges against him, or a written statement of the reasons for the disciplinary actin taken and the supporting evidence. At bottom, Mason's claim based on his initial placement in punitive segregation is too undeveloped to state a plausible claim. Therefore, the court will dismiss this claim, but will do so without prejudice to Mason repleading it in an amended complaint.

b.   <u>Shackling</u>

Mason may also be attempting to allege a Fourteenth Amendment due process claim based on correctional officers shackling him during outdoor recreation time while housed in administrative segregation.[12] To establish a constitutional violation under the Fourteenth Amendment, a pretrial detainee plaintiff would have to plausibly allege that the challenged conditions of confinement amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."); *see also*

---

[12] The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement, while the Due Process Clause of the Fourteenth Amendment applies to claims by pretrial detainees. *See Hubbard v. Taylor* ("*Hubbard I*"), 399 F.3d 150, 166 (3d Cir. 2005). As it appears that Mason was a pretrial detainee at the time of the events in question, the court has analyzed his claims under the Fourteenth Amendment.

*Bistrian*, 696 F.3d at 373 ("Given pretrial detainees' federally protected liberty interests . . . under the Due Process Clause . . . a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." (citation and internal quotation marks omitted)). When analyzing whether a condition of confinement amounts to punishment, the inquiry generally turns on whether the challenged conditions have a purpose other than punishment and whether the conditions are excessive in relation to that purpose. *See Bell*, 441 U.S. at 538–39 ("A court must decide whether the [particular restriction or condition accompanying pretrial detention] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."); *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (explaining that, when evaluating claims of punitive conditions of confinement, "[t]he touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish or are 'but an incident of some other legitimate governmental purpose.'" (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) ("*Hubbard II*"))); *Hubbard I* at 158 (discussing analysis of whether condition of confinement constitutes punishment for Fourteenth Amendment purposes).[13]
In addition, the court should consider the totality of the circumstances in assessing whether a prisoner's conditions of confinement violate the Fourteenth Amendment. *See Hubbard II*, 538 F.3d at 236, 238 (examining totality of circumstances to determine whether conditions of confinement

---

[13] The *Bell* Court also explained:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

441 U.S. at 538–39 (internal quotation marks, citations, and footnote omitted).

constitute Fourteenth Amendment violation); *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996) (explaining that "to determine whether conditions of confinement violate the Eighth Amendment, it is necessary to examine the totality of the conditions at the institution"); *Union Cnty. Jail Inmates v. DiBuono*, 713 F.2d 984, 1000–01 (3d Cir. 1983) (discussing that "the overall length of confinement is only one factor among several that must be considered by a district court in evaluating the totality of circumstances relevant to any alleged constitutional deficiency in shelter").

"Unconstitutional punishment typically includes both objective and subjective components." *Stevenson*, 495 F.3d at 68. "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotation marks and alterations omitted). In general, when alleging a sufficiently culpable state of mind, a detainee must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *cf. Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (per curiam) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners, and pretrial detainees[.]" (internal citations omitted)). Furthermore,

> [i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to

indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 541 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

Here, Mason does not allege that any named defendant had an express intent to punish him by requiring that he remain shackled during his recreation period while in administrative segregation. He also does not allege that the restriction was not rationally related to a legitimate non-punitive government purpose. He further does not allege that any named defendant was personally responsible for his remaining shackled during recreation. *See Ali v. Carney*, Civ. A. No. 20-CV-4320, 2020 WL 7335466, at *6−7 (E.D. Pa. Dec. 14, 2020) (dismissing without prejudice claim based on shackling during outdoor recreation time). As such, Mason has not stated a plausible claim and the court will dismiss it without prejudice to him filing an amended complaint should he able to plead a plausible claim for relief.

### 5.   Claims Based on Deliberate Indifference to Serious Medical Needs

In the complaint, Mason describes several incidents during which he sustained injuries. He does not allege that he was denied treatment for these injuries. To the contrary, he alleges that he received treatment in each instance. Construed liberally, he may be advancing a claim based on a perceived delay in care. If he is, he has failed to state a plausible claim for relief.

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to the prisoner's serious medical needs.[14] *See Farmer*, 511 U.S. at 835. A prison official is not deliberately

---

[14] Although the court has analyzed this cause of action under the Fourteenth Amendment due to Mason's apparent status as a pretrial detainee, even if the court had analyzed it under the Eighth Amendment, the analysis is essentially the same. Nonetheless, the standard under the Eighth Amendment and Fourteenth Amendment for claims related to the alleged deliberate indifference to a prisoner's serious medical needs is essentially the same for purposes of this analysis. *See Goode v. Giorla*, 643 F. App'x 127, 129 (3d Cir. 2016) (per curiam) ("A deliberate indifference claim, under either the Fourteenth or Eighth Amendment, requires acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." (footnote and internal quotation marks omitted)); *Natale*, 318 F.3d at 582 (evaluating pretrial detainee's "Fourteenth Amendment claim for inadequate medical care under the standard

indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted). A plaintiff properly alleges deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

Furthermore, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (concluding complaint did not "specifically allege personal involvement by any of the defendants" where plaintiff alleged that defendant knew of his mental health needs because plaintiff sent defendant a copy of documents and defendant did not respond). In addition, "[i]f a prisoner is under the care of medical

---

used to evaluate similar claims brought under the Eighth Amendment"); *see also Moore v. Luffey*, 767 F. App'x 335, 340 & n.2 (3d Cir. 2019) (evaluating deliberate indifference to serious medical needs claim by pretrial detainee under Eighth Amendment standard, declining to address whether new standard applies to these types of claims by pretrial detainees, and discussing similarity of standards under Eighth and Fourteenth Amendments).

experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236; *see also Carter v. Smith*, 483 F. App'x 705, 708 (3d Cir. 2012) (per curiam) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff."). Yet,

> [e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, . . . though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable.

*McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted).

To the extent that Mason seeks to assert a claim based on delay of medical care, his allegations are conclusory and undeveloped. Most significantly, he fails to allege that any of the named defendants played any role in delaying his medical care. Because "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable, *see Rode*, 845 F.2d at 1207, and Mason fails to allege that the named defendants had any personal involvement in refusing, delaying, or denying him medical care, his claim based on deliberate indifference to a serious medical need is implausible, and the court will dismiss it. As with most of his other claims, since the court cannot state that Mason will be unable to state a plausible claim, this dismissal will be without prejudice to Mason repleading it with sufficient supporting factual allegations in an amended complaint.

### III.  CONCLUSION

For the foregoing reasons, the court will grant the IFP Application and dismiss the complaint for the failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii). This dismissal will be with prejudice as to Mason's claims against the PDP since it is not a proper defendant in this section 1983 action, and without prejudice to his other claims in the complaint. The court will give

23

Mason leave to file an amended complaint if he can correct the issues with his claims identified in this memorandum opinion.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.